## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | | |
|---|---|---|
| TRENT SCHWAB, | * | CIVIL NO. 4:21-cv-00082-SBJ |
| | * | |
| Plaintiff, | * | |
| v. | * | |
| | * | |
| JOHN DOE 1, JAMES ENTREKIN, | * | **MEMORANDUM OPINION** |
| KIRK BAGBY, SHAWNA ISAAC, | * | **AND ORDER ON** |
| CHAD NICOLINO, CLARK ALLEN, | * | **DEFENDANTS' MOTION** |
| ERNESTO ESCOBAR HERNANDEZ, | * | **FOR SUMMARY JUDGMENT** |
| BRADLEY YOUNGBLUT, DANA | * | |
| WINGERT and CITY OF DES MOINES, | * | |
| IOWA, | * | |
| | * | |
| Defendants. | * | |
| | * | |

## I. INTRODUCTION

This action arose from protest activities in downtown Des Moines, Iowa in late May 2020 in the aftermath of the death of George Floyd in Minneapolis, Minnesota. There were peaceful activities at certain times and locations. There were also acts of violence and vandalism at certain times and locations. Trent Schwab walked into the circumstances in the early morning hours as he left work as a bartender. Upon observing the violence and destruction of property which was occurring, he became angry, started yelling and interacted with law enforcement officers. Within moments, Schwab was tackled and arrested by a Des Moines police officer who just arrived at the scene.

Schwab brought this lawsuit against several law enforcement officers and the City of Des Moines. He contends the officer used excessive force and he was arrested without probable cause in violation of his rights under the United States Constitution and the Iowa Constitution. He also asserts various claims under Iowa common law.

Now before this Court is a Motion for Summary Judgment (Dkt. 24) filed by defendants pursuant to Federal Rule of Civil Procedure 56. Defendants assert, *inter alia*, there was probable cause to arrest Schwab and the force used was reasonable. Defendants also assert entitlement to qualified immunity. Schwab resists the motion as to certain claims insisting, *inter alia*, there are questions of fact which preclude summary judgment. Dkt. 30. The Court considers the matter to be fully submitted. For the reasons which follow, the motion is granted as to claims asserted by Schwab under the United States Constitution and as to claims voluntarily abandoned by Schwab. The Court declines to exercise supplemental jurisdiction over remaining state claims.

## II. STANDARDS FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial responsibility of identifying evidence "which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex Corp.*, 477 U.S. at 324).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "A party may object that the material cited to support or dispute a fact

cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At this stage, the court's function is not to determine credibility, weigh the evidence or determine the truth of the matter. *Id.* at 249, 255. Instead, the court views the record in the light most favorable to the nonmoving party and determines whether there is a genuine issue for trial. *Id.*; *see also Torgerson*, 643 F.3d at 1042.

### III. FACTS

The parties submitted a substantial evidentiary record including deposition testimony, personal affidavits, photos, and documents prepared by law enforcement personnel. Much of the events were captured on video from security cameras in downtown Des Moines and body cameras on law enforcement officers also submitted to and reviewed by the Court. The following facts were obtained from those materials and statements of facts provided by the parties' counsel.

Following the death of George Floyd in Minneapolis, Minnesota, various protest activities occurred in multiple locations in downtown Des Moines, Iowa in late May 2020. At the time, James Entrekin was a sergeant with the Des Moines police department assigned to the first watch patrol shift from 9:00 p.m. to 7:00 a.m. Entrekin had not been involved in policing protests during his prior twenty years with the police department. Clark Allen was a police officer and a member of the team managed by Entrekin working the same shift.

On the second night of the protests, May 30, 2020, Entrekin and the team were assigned to

3

secure the perimeter of the police station along with other units. According to Entrekin, "[t]here

was not a lot of information given" to prepare for the first two nights:

> So I gathered my guys together and told them, "Hey, the only information I have is
> that, you know, there's a lot of people in front of the police station and we're going
> to secure the perimeter to make sure no one gets inside the building as they have in
> other parts of the country."
>
> So I told them to spread out. Some guys didn't have helmets, didn't have any gear,
> and so as the night went on, I was able to find a helmet here, a helmet there and get
> guys the stuff that they needed so that was the briefing that I gave them.

Dkt. 24-1 pp. 80, 81. After several hours at the police station, Entrekin and his team were instructed

to report to and secure a courthouse in which protestors had broken into and attempted to start a

fire. *Id.* pp. 82-83. When they arrived, the crowd had already dispersed so the team set up a

perimeter line, stood there for a couple of hours, then returned to the police station. *Id.* p. 83.

As they reached the station, the lieutenant for the first watch shift, Tim Peak, picked up

Entrekin and his team in a box van to report to Court Avenue. According to Entrekin, the police

radio traffic indicated there was "a large group" of protestors which "broke out windows and now

entered the Hy-Vee [grocery store]." *Id.* p. 90. Entrekin and his team were not given any direct

orders and "were headed down there to help other teams that were already there." *Id.* According

to Allen, they were "to basically be a quick reaction force for the officers that were already present,

and in terms of actual orders, wasn't super clear, just to basically prevent disorder." *Id.* p. 125.

Trent Schwab was working the closing shift as a bartender at Shag's which is located on

Court Avenue. He also lived in an apartment on Court Avenue a short walk away. He clocked out

of work and exited the bar at 2:34 a.m. on May 31, 2020. He was not aware of any of the protest

activities but noticed Court Avenue was "a little louder than" usual for that time. *Id.* p. 22. He

began walking on the sidewalk towards his apartment when he observed individuals trying to break

the windows and told them to stop. As described by Schwab:

> Step out of Shag's, I'm just doing my normal walk home, the noise is there, I turn around, and then people are starting to break things . . . . I was filming a video of someone trying to break through my building, telling them to stop, and then I was going to just head upstairs after that, not realizing that my car was not parked in this back lot but it was parked over at Hy-Vee where now I'm hearing glass breaking everywhere. So I wanted to go over there to make sure that my car was safe and no damages would come to that.

*Id.* pp. 23-24. Schwab estimated there were between five and ten people in the immediate vicinity when he was taking the video. *Id.* pp. 24-25.

Schwab started walking again to check on his car and move it. He indicated there was now "a substantial amount of people . . . probably double" and "there was a whole bunch of commotion": "Hearing glass break, shatters, people just running around kind of kicking over trash cans." *Id.* p. 27. At 2:37 a.m., law enforcement vehicles arrived at Hy-Vee in response to reports of people vandalizing property in the area and breaking into Hy-Vee. As Schwab walked, several additional police vehicles passed him on their way to Hy-Vee. According to Schwab, he began yelling in anger at the people causing the commotion:

> I'm hearing all of these things breaking, the cops had just pulled up, they were shooting tear gas, and I was just yelling at the top of my lungs, like, "This is absolutely absurd. This is stupid. This is not our angle on it." . . . I was kind of saying "Black lives still matters. This is not the way to do it." I was just expressing my anger. There were a few people down there I was yelling at.
> * * *
> There were people causing commotion up there, breaking the windows, and there were people just yelling--I don't know what they were doing. So I'm just sitting here, hearing the voices, just, like, yelling my frustration.
> * * *
> Those protests were scheduled as peaceful protests. They weren't supposed to be violent.

*Id.* pp. 28-29.

Schwab rounded the corner to check on his car and stood there for a few seconds. A police officer approached him and deployed a stream of pepper-spray which "just hit [his] shirt." *Id.* pp. 30-31. Schwab took a few steps backwards towards the building, with his hands up, as two officers

continued to approach him. One of the officers followed Schwab around the corner. Schwab ran back with his hands in the air as the officer turned back towards Hy-Vee. As he continued to walk backwards, Schwab was hollering at the officers and pointing his finger at them. He described these events as follows:

> When I was pepper sprayed, he said "Disperse." I said, "Bro, I went around here to check my car," or something of the sort, and he said, "Get out of here." I was, like, "Okay." And then the dude tried to chase me and I threw my hands up, like, "Dude, I'm not doing anything."

*Id.* p. 31.

During this timeframe, Entrekin arrived in the van with the other officers. As described by Entrekin, "there's people everywhere. There's trash cans, things in the street. It looked like just destruction had went through the street there." *Id.* pp. 90-91. As they pulled up, Entrekin pointed to Schwab who was yelling and stomping his feet. According to Entrekin:

> I remember seeing on the south side of Court Avenue a guy in the white shirt very agitated, and at that point I even pointed him out and said, "Guy in the white shirt," because the people in the back of the cube van, the officers, there's no windows on there so they can't see out as we're approaching. They can't see what I can see. So I pointed out, "Hey, when you get out of the van, there's going to be someone over here that's agitated. It might be an issue."
>
> * * *
>
> My plan was to get out, but there's a group getting out in front of us. I don't know if it was swat officers or who got in front of us. My plan was to go to the Hy-Vee, to go where this group that's destroying the Hy-Vee is.

*Id.* pp. 91-92.

The van was stopped in the street and officers exited the van. Three officers, including Allen, approached Schwab. Allen went "immediately over to" Schwab because Entrekin had pointed him out. *Id.* p. 126. Schwab immediately put his hands up and told the officers, "I'm not doing anything, swear to God, I'm just trying to go home." Dkt. 39-2 ¶ 36. The officers told him, "walk!" and "go that way!" and "go!", directing him to continue moving away from Hy-Vee. *Id.* ¶ 38. As described by Schwab:

> Three officers get out . . ., come up to me and ask me what I'm doing. I said, "Trying to go home. Trying to go home." Just kept reiterating that with my hands up, letting them know I'm not a threat or anything. Those officers then said, "All right. Go home." And as I'm walking away, an officer [Entrekin] that was not of the three initially came through and tackled me and another officer pepper sprayed me simultaneously.

Dkt. 24-2 pp. 32-33. Schwab asserts Entrekin was near enough to hear the other officers' commands. Dkt. 39-2 ¶ 39.

According to Entrekin, as he exited the van, "I see a guy coming right between our trucks. I give him a shove, tell him to get back because there's guys getting out." Dkt. 24-2 p. 95. Entrekin then proceeded to the sidewalk where he sees "two officers having a confrontation with" the person in the white shirt. *Id.* Entrekin recalls:

> Upon me coming up the sidewalk where he is having a confrontation with two officers, I saw an arm extended, and it appeared that he was either being maced -- I assume he was being maced because his hand was raised and toward his face with it.

*Id.* pp. 95-96. Schwab disputes he was "having a confrontation" with the officers. Dkt. 30-1 ¶ 29.

Entrekin testified he could not hear the interaction between Schwab and the officers, explaining "there's glass breaking. There was other officers screaming. There was I believe a lady screaming on the sidewalk. It was fairly loud." Dkt. 24-2 p. 96. Entrekin "assumed they were arresting" Schwab, saw "him turn to leave" and "tackled" him. *Id.* Entrekin further explains:

> My understanding was that the other two officers that dealt with him were trying to arrest him and I was assisting them in detaining him. That's why I tackled him because I assumed that, you know, since they had maced him or pepper-sprayed him and there was two officers dealing with him, I knew him to be agitated, I figured they were arresting him, so when he turned around in my eyes at the time it appeared that he was going to flee or run, so that's when I tackled him.

*Id.* pp. 100-01.

Schwab fell on his face onto the sidewalk. He had no opportunity to break his fall and his head bounced off the sidewalk. He suffered bruises and abrasions on his knees, forehead, and

elbows. Entrekin straddled Schwab's back and placed zip ties on Schwab's wrists. Allen assisted in handcuffing Schwab. Dkt. 39-2 ¶ 45. This was about 2:39 a.m.

As he laid on the ground, Schwab told Entrekin and Allen that he "was just trying to stop them from breaking the windows on my apartment." *Id.* ¶ 46. Schwab told Entrekin and Allen his address on Court Avenue. *Id.* ¶ 47. Entrekin and Allen did not discuss the reason for Schwab's arrest. *Id.* ¶ 48. Schwab told Entrekin that he "just didn't want them to f*** his car up" to which Entrekin responded, "I understand." *Id.* ¶¶ 50-51. Schwab also told Entrekin, "I just got off of work, officer" and explained money in his bag was his tips from working and that he had just clocked off at Shag's. *Id.* ¶¶ 52-53. Schwab asked Entrekin multiple times why he was being detained and Entrekin did not respond. *Id.* ¶¶ 58-59, 62, 63. Schwab does not claim any discomfort throughout his interaction with Entrekin. Dkt. 30-1 ¶ 39.

Entrekin did not perform any follow-up investigation or talk to the officers who had been interacting with Schwab. As explained by Entrekin, he expected the officers to be there after he tackled Schwab but they were not. Apparently, the identity of those officers remains unknown. The only arrest Entrekin made during the several days of protests was the arrest of Schwab.

Schwab was placed near a police van to be transported with other individuals who were arrested. Schwab and others complained about the effects of teargas in the air. When asked if he had any injuries, Schwab indicated his knee was painful.

Detective Bradley Youngblut volunteered to work the night of May 30, 2020 due to the protests and assisted with perimeter security at the police station. Dkt. 24-2 pp. 223, 240. As he was leaving for home, the reports began regarding the disturbance and damage occurring on Court Avenue. *Id.* p. 223. Youngblut "piled into" a van with several other detectives to assist. *Id.* pp. 231-32. During his deposition, Youngblut testified "[i]t was really not clear" as to their duties upon arrival and noted "[t]his was a first for many of us." *Id.* p. 264. He further explained: "It was, 'We

need to go get control of Court Avenue back. They've destroyed businesses and God knows what

down there, we need to stop that.'" *Id.*

At some point after arrests had been made, Youngblut was directed by supervisors to seize

the phones of the arrestees from Court Avenue. Dkt. 39-2 ¶ 81. He obtained an Apple iPhone from

Schwab at approximately 4:00 a.m. on May 31, 2020, without a warrant. *Id.* ¶ 82. He did not know

what the arrestees were being charged with. *Id.* ¶ 90. Schwab asked Youngblut when his phone

would be returned and Youngblut told him, "at some point at a later date." *Id.* ¶ 83. Another officer

stated to Youngblut that he did not "think it was a great idea, but the bosses thought of it, so they

think it is." *Id.* ¶ 85. Youngblut responded that it was at least "a nice inconvenience" for the

arrestees. *Id.* ¶ 86.

During his deposition testimony, Youngblut explained "there was a really high likelihood

that people had been recording what was going on." Dkt. 24-2 pp. 237-38. He further explained:

> [Supervisors] decided that this strategy for using the phones and potentially doing
> search warrants to recover any evidence would be tasked to [the detective] office.
> I was there at the time and that's why we were told to do it.
> * * *
> In this case everyone was under arrest. There is a potential that they hold evidence
> on their phone. It's very clear that people put a lot of data in their phones, and in
> this situation they're all under arrest but several of them were recording everything,
> and even when they're on the body cameras under arrest, they're still recording and
> making their own statements implicating themselves in things, screaming and
> hollering at different things.
>
> You know, this seizure was went in line with the arrests that were made and the
> potential that there was evidence held within these devices.

*Id.* pp. 238-39, 249. Youngblut also noted Schwab was holding his phone and "trying to record"

his interactions with Youngblut. *Id.* p. 265.

Schwab and others arrested were transported to jail by Allen and police officer Ernesto

Escobar Hernandez who had been assigned to driving the transport van. Escobar was not

personally involved in making any arrests nor did he witness any arrests. Escobar searched

9

Schwab's possessions and placed him in the wagon.

Allen and Escobar completed digital jail "booking sheets" on a computer in the van for those individuals being transported. As instructed, they utilized one case number for all the individuals. Normally, the arresting officer prepares the booking sheet. Entrekin "had no direct conversation about charging" Schwab. *Id.* p. 102. There were ongoing communications with the county attorney on what the charges on individuals should be. Dkt. 30-1 ¶ 47. While the arrests were being processed, there was direction to charge everyone with criminal mischief and rioting, unless there was more specific information about property damage or looting. *Id.* ¶ 48. That information was given to Allen and Escobar by Lieutenant Kirk Bagby. *Id.* ¶ 49. Bagby did not make charging decisions; rather he was relaying information from command staff to officers transporting individuals to jail. *Id.* ¶ 51.

Allen completed a jail booking sheet for Schwab listing "rioting" and "criminal mischief 2nd" as charges. Dkt. 24-2 p. 209. According to Allen, he had nothing to do with any charging decisions. *Id.* pp. 140, 152. He had no reason not to trust the information he was provided. *Id.* p. 158. Escobar testified he had no reason to believe there was a lack of probable cause to charge the individuals in the van with unlawful assembly. *Id.* p. 183. He also had no concern about charging those individuals with rioting or failure to disperse. *Id.* pp. 183-84.

Shawna Isaac was a Des Moines police officer assigned to Neighborhood Based Services Delivery as a community outreach officer. She was assigned by Bagby to book and process individuals arrested during the protest activities with two other officers from her squad. They filled out charging document forms based on information they received about where the individuals were arrested. Isaac filed two criminal complaints charging Schwab with Criminal Mischief in the 2nd Degree and Participate in a Riot. *Id.* pp. 212-15. Isaac stated in the Criminal Mischief complaint that "Schwab did intentionally damage, deface, alter or destroy tangible property, to-wit:

(downtown area) the cost of replacing, restoring and/or repairing of which exceeds $1,500 but does not exceed $10,000." *Id.* p. 214. She stated in the Participate in a Riot complaint that "Schwab did willingly join in or remain a part of a riot by assembling with multiple other persons in a violent manner, to the disturbance of others, and with use of unlawful force or violence by them or any of them against another person or causing property damage from $1500-10,000, knowing or having reasonable grounds to believe it to be a riot." *Id.* p. 212. Both complaints included the following affidavit signed by Isaac: "I, the undersigned, being duly sworn, state that all facts in this Complaint and Affidavit, known by me or told to me by other reliable persons form the basis for my belief that the defendant committed this crime." *Id.* pp. 212, 214.

Isaac testified she did not have concerns about the charges against the arrestees being accurate. *Id.* p. 203. Part of her duties during the protests was driving a van to transport individuals who had been arrested at the courthouse, the state capitol building, and on Court Avenue. Isaac described the locations as "very chaotic" and "scary at times." *Id.* p. 196. She further explained:

> I wouldn't say that I had concern with it because I was listening to the radio traffic just like everyone else was, and I could hear the volleys going off of the flash base. I was in the middle of that, right, so I knew that it was chaos, I knew it was a bad situation. We had already driven our wagon through a couple different locations it was really hairy and quite frankly a little scary to get in there, but it was kind of scary at some of those times. Like when they were holding the crowds back at Court Avenue -- not Court Avenue, at the courthouse, after they were trying to light it on fire, we were trying to get in and out without our wagon being overturned and not being overtaken.
>
> So to the best of our knowledge, everything we were being told to fill out and all the different charges for the different people were credible. We had no reason to think that they weren't.

*Id.* pp. 203-04.

Appearance bonds in the amount of $7,000 were posted to secure Schwab's release from custody on May 31, 2020. Dkt. 30-3 pp. 12-15. The specific time Schwab was released from jail is not readily apparent from the parties' submissions.

In the afternoon of May 31, 2020, the county attorney provided updated charging information to Sergeant Chad Nicolino and directed that all charges be refiled as Rioting, Criminal Mischief 2nd Degree and Failure to Disperse. Dkt. 30-1 ¶ 58. On June 1, 2020, Nicolino filed criminal complaints charging Schwab with Participate in a Riot, Unlawful Assembly, and Failure to Disperse. Dkt. 24-2 pp. 216-17; Dkt. 30-3 pp. 7-8, 10-11. Affidavits supporting the complaints stated:

> Defendant was a member of a group (of WELL over three people) that assembled to protest allegations of racism and police brutality. Initially, the protest was peaceful. The protests evolved to rioting in the late evening of hours of May 30, 2020 into the early morning hours of May 31, 2020 with many of the remaining participants engaging in violent, intimidating and destructive behavior.
>
> Police officers clearly, loudly and repeatedly instructed all participants to disperse.
>
> Despite those instructions, Defendant willfully stayed among the group that remained. This group was engaging in assaultive conduct, the intimidation of people and destruction of property. The participants barricaded public streets. Private businesses and public buildings were damaged with spray paint. Windows were shattered. Fires were started and rocks were thrown at people including police officers. Citizens working in the area were afraid for their safety.
>
> This destruction was open, extensive and obvious, yet the defendant willfully remained among the group of persons responsible for this conduct all of which occurred in the City of Des Moines, Polk County, Iowa.

Dkt. 24-2 p. 217; Dkt. 30-3 pp. 8, 11. Nicolino signed the statements which was under the heading:

> I, the undersigned, being duly sworn, state that all facts contained in this Complaint and Affidavit, known by me or told to me by other reliable persons form the basis for my belief that the defendant committed this crime.

*Id.* Nicolino copied and pasted the language, which was written by someone in the county attorney's office.

After he was released from jail, Schwab went to the Des Moines Police Station on three occasions seeking his cell phone. On June 1, 2020, Schwab filed a Claim for Return of Seized Property with the Polk County District Court for the return of his iPhone. Dkt. 30-3 p. 5. On that

date, Youngblut was directed to return the confiscated phones to owners. According to Youngblut, search warrants would be required to view the content on the phones which would take "days and days of work" to complete the process for all the phones seized. Dkt. 24-2 p. 248. He further noted that, even with a warrant, information could not be accessed on iPhones protected with security locks. *Id.* pp. 247, 279. As stated in his report: "Due to the ongoing unrest and the length of time it would take to complete a search warrant, and attempt to gather further information off of the devices that most likely would not be able to be accessed, the determination was to release the phones to the arrested parties." *Id.* p. 279. Youngblut made contact with Schwab's mother on June 1, 2020 and Schwab had his phone back by June 2, 2020.

Also on June 1, 2020, Youngblut had a conversation with Schwab's boss, who vouched for his employment shift and knowledge of his apartment being a short walk from work; he opined that Schwab would not have had time to engage in the rioting. Dkt. 30-1 ¶ 60. Youngblut contacted the county attorney with this information so it could be considered as to continuing with prosecution. *Id.* ¶ 61. The county attorney moved to dismiss the charges against Schwab and an Order of Dismissal was entered by the state court on June 22, 2020. Dkt. 24-2 p. 218.

### IV. SCHWAB'S COMPLAINT

Trent Schwab filed an initial Petition at Law in Iowa state court which was removed by defendants to this United States District Court for the Southern District of Iowa. Dkt. 1. Schwab subsequently filed an Amended Petition at Law asserting various claims against law enforcement officers James Entrekin, Kirk Bagby, Shawna Isaac, Chad Nicolino, Clark Allen, Ernesto Escobar Hernandez, Bradley Youngblut, Dana Wingert, an unidentified John Doe, and the City of Des Moines. Dkt. 11. Counts 1 and 2 assert claims of illegal seizure in violation of the Fourth Amendment to the United States Constitution and Article I, section 8 of the Iowa Constitution. Counts 3 and 4 assert claims of excessive force in violation of the Fourth Amendment to the United

States Constitution and Article I, section 8 of the Iowa Constitution. Counts 5 and 6 assert claims of retaliation in violation of the First Amendment to the United States Constitution and Article I, section 7 of the Iowa Constitution. Counts 7 and 8 assert claims of conspiracy in violation of the United States Constitution and the Iowa Constitution. Counts 9 and 10 assert claims of deliberately indifferent policies, practices, customs, training and supervision in violation of the United States Constitution and the Iowa Constitution. Count 11 asserts state law claims of intentional infliction of emotional distress. Count 12 asserts state law claims of malicious prosecution. Count 13 asserts state law claims of false arrest/imprisonment. Count 14 asserts state law claims of libel. Count 15 asserts state law claims of assault and battery.

## V. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the multiple claims asserted by Schwab. Dkt. 24. As argued in their supporting brief in introduction:

> There are no disputed factual issues in this case. Nearly all of the events are captured on video, and the Defendants accept Mr. Schwab's deposition testimony of events for purposes of summary judgment. Based on this undisputed record, the officers had probable cause to arrest Mr. Schwab. The presence of probable cause thwarts nearly all of Schwab's arguments, including the First Amendment retaliation claims, the conspiracy allegations, and the common law torts. Further, there is no clearly established law to be free from seizure when one deliberately places oneself in the middle of a riot. It is also uncontroverted that the force used was within acceptable police practices, especially in the context of a riot. Finally, the record is devoid of any evidence that the City of Des Moines or Chief Wingert were deliberately indifferent, or in any way, failed in hiring, training, and supervising these officers.

Dkt. 27 p. 2. Defendants follow with several specific challenges to Schwab's claims, including the assertion of qualified immunity as to claims under the United States Constitution.

In response, Schwab does not resist the motion as to the conspiracy claims asserted under Counts 7 and 8, the deliberate indifference claims asserted under Counts 9 and 10, the claims of

intentional infliction of emotional distress asserted under Count 11, the libel claim asserted against

Escobar under Count 14, and the claims asserted against the unidentified John Doe. Dkt. 30 pp. 2-

3. Schwab contends defendants are not entitled to summary judgment as to the remaining claims.

He argues in introduction to his brief:

> Contrary to Defendants' claim, there was no unlawful assembly occurring when Trent Schwab was tackled by Defendant Entrekin and then arrested. Schwab was by himself in an area where he had every right to be and was dispersing in compliance with officer orders. He explained to officers that he lived, worked, and parked his car on Court Avenue and had just gotten off work—but to no avail. Schwab was the victim of a mass-charging and seizure procedure that was entirely unsupported by probable cause.

*Id.* p. 2.

## VI. COURT'S ANALYSIS

Schwab asserts claims against defendants under the United States Constitution, the Iowa

Constitution and Iowa common law. This Court has original jurisdiction over the alleged violations

of the United States Constitution and supplemental jurisdiction over the Iowa state claims. 28

U.S.C. § 1367(a); *see also Starkey v. Amber Enterprises, Inc.*, 987 F.3d 758, 765 (8th Cir. 2021).

If the Court dismisses all the claims over which it has original jurisdiction, it "'may decline to

exercise supplemental jurisdiction" over the state claims. *Zubrod v. Hoch*, 907 F.3d 568, 580 (8th

Cir. 2018) (quoting 28 U.S.C. § 1367(c)(3)). According to the Eighth Circuit, "[i]n the 'usual case'

where all federal claims are dismissed on a motion for summary judgment, 'the balance of factors

to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience,

fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-

law claims.'" *Starkey*, 987 F.3d at 765 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343,

350 n. 7 (1988)). As such, this Court will first separately address Schwab's alleged violations of

the United States Constitution.

**A. Alleged Violations of the United States Constitution**

Schwab's federal claims against the law enforcement officers are brought pursuant to 42

U.S.C. § 1983 which provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State . . . subjects, or causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be liable to
> the party injured in an action at law[.]

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a

right secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S.

42, 48 (1988). "'Liability for damages for a federal constitutional tort is personal, so each

defendant's conduct must be independently assessed. Section 1983 does not sanction tort by

association.'" *Grider v. Bowling*, 785 F.3d 1248, 1252 (8th Cir. 2015) (quoting *Smith v. City of

Minneapolis,* 754 F.3d 541, 547 (8th Cir. 2014) (internal quotation marks omitted)). Accordingly,

"'a plaintiff must show each individual defendant's personal involvement in the alleged

violation.'" *Molina v. City of St. Louis, Missouri*, 59 F.4th 334, 344 (8th Cir. 2023) (quoting *White

v. Jackson*, 865 F.3d 1064, 1080-81 (8th Cir. 2017)).

Law enforcement officers are entitled to qualified immunity from civil liability under §

1983 when their "'conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known.'" *Rivas-Villegas v. Cortesluna*, 142 S.Ct. 4, 7

(2021) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017)); *see also Pearson v. Callahan*, 555

U.S. 223, 231 (2009); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "Qualified immunity

balances two important interests—the need to hold public officials accountable when they exercise

power irresponsibly and the need to shield officials from harassment, distraction, and liability

when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. It is "an immunity from

suit rather than a mere defense to liability," *id.*, and "protects all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 580 U.S. at 79; *see also Ross v. City of Jackson, Missouri*, 897 F.3d 916, 920 (8th Cir. 2018) (quoting *White v. Pauly*, 580 U.S. at 78-79).

To determine whether qualified immunity applies, the Court considers two questions. First, when viewed in the light most favorable to plaintiff, do the facts demonstrate the officer violated a constitutional right? Second, was the constitutional right clearly established at the time of the officer's alleged violation? *See*, *e.g.*, *Laney v. City of St. Louis, Missouri*, 56 F.4th 1153, 1156 (8th Cir. 2023); *Just v. City of St. Louis, Missouri*, 7 F.4th 761, 766 (8th Cir. 2021); *Quraishi v. St. Charles Cnty., Missouri*, 986 F.3d 831, 835 (8th Cir. 2021); *Ross*, 897 F.3d at 920; *Hosea v. City of St. Paul*, 867 F.3d 949, 955 (8th Cir. 2017); *Jackson*, 865 F.3d at 1074. If the answer to either question is "no," the officer is entitled to qualified immunity. *Laney*, 56 F.4th at 1156; *Jackson*, 865 F.3d at 1074.

"In order to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1008 (8th Cir. 2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also*, *e.g.*, *Bell v. Neukirch*, 979 F.3d 594, 606-07 (8th Cir. 2020) (defining "clearly established" rights); *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (en banc) (same). "'[E]xisting precedent must have placed the statutory or constitutional question beyond debate.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011)). "Reciting an abstract right at a high level of generality will not suffice." *Ehlers*, 846 F.3d at 1008. "The dispositive question is "whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 577 U.S. at 11 (quoting *al–Kidd,* 563 U.S. at 741). The "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Rivas-Villegas*, 142 S.Ct. at 8 (quoted citation omitted).

With these well-established principles in mind, the Court will address each of Schwab's federal constitutional claims as asserted against individual defendants.

### 1. Alleged Illegal Seizure Under Count I

Under Count I, Schwab asserts claims of illegal seizure in violation of the Fourth Amendment to the United States Constitution against Entrekin, Bagby, Isaac, Nicolino, Allen, Escobar and Youngblut. Dkt. 11 ¶¶ 113-17. Schwab contends "Defendants violated Plaintiff's clearly established federal constitutional rights by seizing Plaintiff without reasonable suspicion or probable cause to do so; by seizing Plaintiff's property without a warrant or other legal cause to do so; and by charging Plaintiff with crimes without probable cause." *Id.* ¶ 114. Defendants contend they are entitled to qualified immunity because there was probable cause for the arrest of Schwab and seizure of his phone.

Pursuant to the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The Fourth Amendment, as applied to the States through the Fourteenth Amendment, requires that an officer have probable cause before making a warrantless arrest." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (citing *Stufflebeam v. Harris,* 521 F.3d 884, 886 (8th Cir. 2008)). "'It is well established that a warrantless arrest without probable cause violates an individual's constitutional rights under the Fourth and Fourteenth Amendments.'" *Ross*, 897 F.3d at 920 (quoting *Joseph v. Allen*, 712 F.3d 1222, 1226 (8th Cir. 2013) (quoted citations omitted)). In turn, "[a] warrantless arrest does not violate 'the Fourth Amendment if it is supported by probable cause.'" *Jackson*, 865 F.3d at 1074; *see also Ehlers*, 846 F.3d at 1008; *Bernini v. City of St. Paul*, 665 F.3d 997, 1003 (8th Cir. 2012).

"An officer has probable cause to make a warrantless arrest when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Jackson*, 865 F.3d at 1074 (internal quotation marks and citations omitted); *see also*, *e.g.*, *Ehlers*, 846 F.3d at 1009. "'Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.'" *Just*, 7 F.4th at 767 (quoting *Ross*, 897 F.3d at 920 (citation omitted)). "The standard is a 'practical, nontechnical conception' that calls for 'facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" *Bell*, 979 F.3d at 603 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111-112 (1975)).

An officer "'is entitled to qualified immunity for a warrantless arrest if the arrest was supported at the time by at least 'arguable probable cause.'" *Ross*, 897 F.3d at 921 (quoting *Joseph*, 712 F.3d at 1226 (quoted citations omitted)); *see also*, *e.g.*, *Just*, 7 F.4th at 767; *Quraishi*, 986 F.3d at 836; *Hosea*, 867 F.3d at 955; *Jackson*, 865 F.3d at 1074; *Ehlers*, 846 F.3d at 1008-09. "'Arguable probable cause exists even where an officer mistakenly arrests a suspect believing [the arrest] is based on probable cause if the mistake is 'objectively reasonable.'" *Ross*, 897 F.3d at 921 (quoted citations omitted); *see also*, *e.g.*, *Quraishi*, 986 F.3d at 836; *Bell*, 979 F.3d at 607; *Hosea*, 867 F.3d at 955; *Jackson*, 865 F.3d at 1074; *Ehlers*, 846 F.3d at 1009.

As explained by the Eighth Circuit, "the terms 'probable cause' and 'arguable probable cause' are not interchangeable, and each term serves a different purpose within the qualified immunity analysis." *Brown v. City of St. Louis, Missouri*, 40 F.4th 895, 901 (8th Cir. 2022). The Eighth Circuit has "assigned consideration of *actual* probable cause to [the] constitutional violation prong analysis while reserving any consideration of *arguable* probable cause for [the] clearly established prong analysis." *Id.* Accordingly, "even if an officer arrests an individual

without *actual* probable cause—in violation of the Constitution—he has not violated that individual's 'clearly established' rights for qualified immunity purposes if he nevertheless had *arguable* probable cause to make the arrest." *Id.* (internal quotation marks and citation omitted). "[Q]ualified immunity may apply if there was probable cause or arguable probable cause to arrest [an individual] for *any* crime at the time of the arrest." *Webster v. Westlake*, 41 F.4th 1004, 1012 (8th Cir. 2022) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).

"[A]rguable probable cause is determined at the time of arrest and after-acquired knowledge is irrelevant to the analysis." *Hosea*, 867 F.3d at 956. "The fact that the person arrested is later found innocent is [also] not material." *Joseph*, 712 F.3d at 1226. "Whether a law enforcement officer had probable cause at the time of arrest is a question of law." *Id.* at 1226-27; *see also*, *e.g.*, *Just*, 7 F.4th at 767; *Hosea*, 867 F.3d at 955.

In this case, defendants contend there was probable cause to arrest and charge Schwab with participating in a riot, unlawful assembly, and failure to disperse. At the time of Schwab's arrest, participation in a riot was defined under Iowa statutory law as follows:

> A riot is three or more persons assembled together in a violent manner to the disturbance of others, and with any use of unlawful force or violence by them or any of them against another person, or causing property damage. A person who willingly joins or remains a part of a riot, knowing or having reasonable grounds to believe that it is such, commits an aggravated misdemeanor.

Iowa Code § 723.1 (2020). An unlawful assembly was defined as follows:

> An unlawful assembly is three or more persons assembled together, with them or any of them acting in a violent manner, and with intent that they or any of them will commit a public offense. A person who willingly joins in or remains a part of an unlawful assembly, knowing or having reasonable grounds to believe that it is such, commits a simple misdemeanor.

Iowa Code § 723.2 (2020). A failure to disperse was defined as follows:

> A peace officer may order the participants in a riot or unlawful assembly or persons in the immediate vicinity of a riot or unlawful assembly to disperse. Any person within hearing distance of such command, who refuses to obey, commits a simple

misdemeanor.

Iowa Code § 723.3 (2020).

Upon review of the evidentiary record, this Court concludes as a matter of law there was probable cause to seize and arrest Schwab without a warrant. By his own testimony, Schwab was located in an area with three or more other persons present, some of whom acting in a violent manner, causing property damage, with intent to commit, and were committing, a public offense. Moreover, again by his own testimony, Schwab himself was acting in an angry manner by yelling, gesturing and stomping his feet. Further, officers had given orders directly to Schwab to disperse. Contrary to his argument, Schwab was not merely in "proximity to an area where unlawful activity had taken place earlier." Dkt. 30 p. 19. His own particular agitated conduct interacting with law enforcement officers, which is undisputed and depicted on video, cannot be ignored. Nor is Schwab's argument he was merely "walking by himself on a public sidewalk", *id.* at 16, supported by the testimony and video submitted to the Court. Inconsistently, Schwab notes "the officers did not arrest or harass *many other citizens* who were in the area." *Id.* p. 18 (emphasis added). While Schwab himself may have had legitimate, non-criminal reasons for being present, and was intending to proceed to his apartment, the totality of the circumstances at the time of his arrest was sufficient to lead a reasonable officer to believe he had committed or was committing a criminal offense of unlawful assembly and failure to disperse.

And even though Schwab's reason for his presence in the area was unrelated to the protests and violence being conducted by others, any mistake Entrekin or other law enforcement officers made in that regard was objectively reasonable and therefore arguable probable cause existed for his seizure and arrest. Under the particular circumstances with respect to Schwab, notably his own agitated demonstrative conduct within the context of the events occurring on Court Avenue, Entrekin's actions were within the range of objectively reasonable police conduct. Schwab has not

presented law demonstrating such actions under such circumstances were in violation of clearly established constitutional rights. Instead, Schwab broadly notes "[t]here are many cases in the Eighth Circuit [that] hold '[i]t is clearly established that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment.'" Dkt. 30 p. 29 (quoting *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010)). While correct, "[r]eciting an abstract right at a high level of generality will not suffice." *Ehlers*, 846 F.3d at 1008. Schwab has not shown the alleged violative nature of the particular actions by Enterkin in the specific context of this matter was clearly established.

The Court also concludes there was probable cause to seize Schwab's iPhone under the totality of the particular circumstances of this case. It was objectively reasonable to believe his phone contained evidence of crimes being committed by others prior to his own arrest. In fact, Schwab testified he "was filming a video of someone trying to break through [his] building."

And Schwab has again not shown the alleged constitutional violative nature of the particular actions by Youngblut in the specific context of this matter was clearly established. Schwab relies upon *United States v. Place*, 462 U.S. 696 (1983) and *Robbins v. City of Des Moines*, 984 F.3d 673 (8th Cir. 2021). But in the Court's view, the underlying circumstances at issue in those cases are significantly distinct from the context of the seizure of Schwab's phone here, and do not make it sufficiently clear that a reasonable official would understand that Youngblut's actions were violative of the Fourth Amendment as of late May 2020.

It is undisputed that Youngblut was directed to seize Schwab's phone by supervisors who are not named defendants in this case. And it bears repeating: "'Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed. Section 1983 does not sanction tort by association.'" *Grider*, 785 F.3d at 1252 (quoted citation omitted). It is also a "settled principle that law enforcement officers may rely on

information provided by others in the law enforcement community, so long as the reliance is reasonable." *Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005). Accordingly, "an assisting officer is entitled to rely on the probable cause determination of the arresting officer and may receive qualified immunity as long as the reliance is reasonable." *Ehlers*, 846 F.3d at 1010; *see also Baude v. Leyshock*, 23 F.4th 1065, 1074-75 (8th Cir. 2022) (quoting *Ehlers*, 846 F.3d at 1010). Under the particular circumstances presented in the evidentiary record before this Court, Youngblut's actions in seizing Schwab's phone at the direction of supervisors, and his reliance thereon, was reasonable.

The same conclusion is reached as to the other named defendants under Count I. Bagby, Isaac, Nicolino, Allen, and Escobar all relied upon information provided by others in the law enforcement community as to their specific actions relating to Schwab's seizure and arrest. And based on the evidentiary record before this Court, their reliance was reasonable under the particular circumstances occurring on May 30 and 31, 2020 in downtown Des Moines. Schwab has not presented sufficient facts showing any personal, particularized actions of Bagby, Isaac, Nicolino, Allen, or Escobar were violative of clearly established Fourth Amendment rights.

In sum, even when viewed in the light most favorable to Schwab, the particular facts in the evidentiary record before this Court do not demonstrate the named defendant officers violated a clearly established right under the Fourth Amendment at the time of their alleged violations as to the seizure and arrest of Schwab and seizure of his phone. Schwab has not sufficiently shown questions of fact exist regarding whether probable cause existed. Defendants are therefore entitled to qualified immunity and judgment as a matter of law as to the claims brought pursuant to the Fourth Amendment to the United States Constitution under Count I.

### 2. Alleged Excessive Force Under Count 3

Under Count 3, Schwab asserts a claim of excessive force in violation of the Fourth Amendment to the United States Constitution against Entrekin. Dkt. 11 ¶¶ 124-29. Schwab

contends the force used by Entrekin "was excessive and applied maliciously and sadistically for the purpose of causing harm and not in a good faith effort to achieve a legitimate purpose." *Id.* ¶ 125. Defendants contend the force utilized by Entrekin in taking Schwab to the ground and applying zip ties to his wrists was reasonable under the circumstances occurring in the early morning of May 31, 2020.

"'The Fourth Amendment protects citizens from being seized through excessive force by law enforcement officers.'" *Thompson v. Monticello, Arkansas*, 894 F.3d 993, 998 (8th Cir. 2018) (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1202 (8th Cir. 1999)). Claims that law enforcement officers used excessive force while making an arrest or other "seizure" of persons are analyzed under an "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). As instructed by the Supreme Court:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers'

> actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Id.* at 396-97 (internal citations omitted); *see also Lombardo v. City of St. Louis, Missouri*, 141 S.Ct. 2239, 2241 (2021) (Facts and circumstances to consider in a particular case include "'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). The principles set forth in *Graham* have been repeatedly cited and relied upon by the Eighth Circuit including within the context of arrests made during protest activities. *See, e.g.*, *Laney*, 56 F.4th at 1156; *McDaniel v. Neal*, 44 F.4th 1085, 1090 (8th Cir. 2022); *Fischer v. Hoven*, 925 F.3d 986, 988 (8th Cir. 2019); *Hosea*, 867 F.3d at 957; *Jackson*, 865 F.3d at 1074, 1079-80; *Ehlers*, 846 F.3d at 1010-11; *Bernini*, 665 F.3d at 1006. Whether the force used by an officer "was constitutionally excessive is an issue of law." *Brossart v. Janke*, 859 F.3d 616, 624 (8th Cir. 2017); *see also Kelsay*, 933 F.3d at 979, 981.

Here, under the particular facts and circumstances of this case, the Court concludes as a matter of law the force utilized by Entrekin was objectively reasonable. Given the context of the ongoing protests occurring on May 30 and 31, 2020 in downtown Des Moines, and the reports of violence and property damage, the circumstances Entrekin encountered has he traveled to Court Avenue were tense, uncertain, and rapidly evolving. Officer Isaac described the events as "very chaotic" and "scary at times." Schwab himself testified to the violence, commotion, glass breaking and other property damage occurring on Court Avenue. The severity of the security problems and threats reasonably perceived by law enforcement officers at the time were significant. In addition,

Entrekin's observations of Schwab acting agitated, yelling, gesturing, and stomping his feet in interaction with other law enforcement officers is undisputed and depicted on video. In the opinion of this Court, Entrekin's split-second decision after he left the van to tackle Schwab and place zip ties on his wrists was objectively reasonable under the particular circumstances occurring in the early morning of May 31, 2020 on Court Avenue in downtown Des Moines.

Also noteworthy is the minor nature of Schwab's injuries resulting from the force used by Entrekin. "'The degree of injury is certainly relevant insofar as it tends to show the amount and type of force used.'" *McDaniel*, 44 F.4th at 1090 (quoting *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011)); *see also Fischer*, 925 F.3d at 988. Schwab suffered bruises and abrasions on his knees, forehead, and elbows. He did not complain of discomfort throughout his interaction with Entrekin. The degree of injuries suffered by Schwab do not indicate the force used by Entrekin was unconstitutionally excessive under the particular circumstances occurring at the time.

Even if his use of force was excessive, Entrekin is entitled to qualified immunity unless the excessiveness of the force was clearly established on the date of the incident. "The right to be free from excessive force is, of course, well established." *Ehlers*, 846 F.3d at 1012. But "'[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.'" *McDaniel*, 44 F.4th at 1091 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (internal quotation marks omitted)); *Kelsay*, 933 F.3d at 980 (same). "'[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers." *McDaniel*, 44 F.4th at 1091 (citation omitted). "A plaintiff must identify either controlling authority or a robust consensus of cases of persuasive authority that placed the statutory or constitutional question beyond debate at the time of the alleged violation." *Kelsay*, 933 F.3d at 979 (internal quotation marks and citation omitted).

Schwab has not presented a case or body of case law that clearly established as of May 31, 2020, that Entrekin's use of force was unconstitutionally excessive, even when viewing the facts in the light most favorable to Schwab. Schwab has not cited precedent existing at the time of his arrest which squarely governs the specific facts leading to Entrekin's actions. Nor has Schwab shown a robust consensus of authority existed at the time of his arrest clearly establishing the particular use of force by Entrekin violates the Fourth Amendment. Under the precedent and principles set forth by the Supreme Court and Eighth Circuit, Entrekin is entitled to qualified immunity on the claim of excessive force under the United States Constitution.

### 3. Alleged First Amendment Retaliation Under Count 5

Under Count 5, Schwab asserts claims of retaliation in violation of the First Amendment to the United States Constitution against Entrekin, Bagby, Isaac, Nicolino, Allen, Escobar and Youngblut. Dkt. 11 ¶¶ 136-44. Schwab contends "Defendants violated Plaintiff's clearly established federal constitutional rights by pepper-spraying him, tackling him to the ground, arresting him, seizing his phone, and charging him with crimes in retaliation for his exercise of his First Amendment rights." *Id.* ¶ 138. Defendants contend their actions were not retaliatory against any expression of constitutional rights but, instead, were responsive to "Schwab's agitated, confrontational and fleeing behavior from the scene of the riot." Dkt. 27 p. 36. After the hearing on the summary judgment motion, Schwab notified the Court he does not resist the dismissal of the claims under Count 5 as to Isaac, Nicolino, Allen, and Escobar, and Dkt. 38. The Court will therefore only address the claims against Entrekin, Bagby and Youngblut.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 139 S.Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S.

250, 256 (2006)); *Laney*, 56 F.4th at 1157 (same). As explained by the Supreme Court:

> If an official takes adverse action against someone based on that forbidden motive, and "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences," the injured person may generally seek relief by bringing a First Amendment claim.

> To prevail on such a claim, a plaintiff must establish a "causal connection" between the government defendant's "retaliatory animus" and the plaintiff's "subsequent injury." It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.

*Nieves*, 139 S.Ct. at 1722 (internal citations omitted).

According to the Eighth Circuit, "it is clearly established that using an arrest (that lacks arguable probable cause) to interfere with First Amendment activity is a constitutional violation." *Quraishi*, 986 F.3d at 839. On the other hand, "a First Amendment retaliatory arrest claim is defeated by a showing of probable cause (or arguable probable cause)." *Just*, 7 F.4th at 768 (citing *Nieves*, 139 S. Ct. at 1724); *see also Galarnyk v. Fraser*, 687 F.3d 1070, 1076 (8th Cir. 2012) (existence of probable cause is fatal to First Amendment retaliatory arrest claim). This Court has already determined both actual probable cause and arguable probable cause existed to seize and arrest Schwab and for the seizure of his phone. Therefore, defendants Entrekin, Bagby, and Youngblut are entitled to qualified immunity on the claims of unconstitutional retaliatory seizure and arrest under the First Amendment.

Even if there was a lack of probable cause, to prevail on the retaliation claim, Schwab must show he "'engaged in protected [First Amendment] activity.'" *Molina*, 59 F.4th at 338 (quoting *Quraishi*, 986 F.3d at 837); *see also Dreith v. City of St. Louis, Missouri*, 55 F.4th 1145, 1148 (8th Cir. 2022) (setting forth requisites to establish First Amendment retaliation claim); *Bernini*, 665 F.3d at 1007 (same). There is a lack of evidence Schwab was engaged in protected First Amendment activity prior to or at the time of his arrest. Schwab even testified he was not

demonstrating or trying to join the protestors before he was arrested. Dkt. 24-2 p. 37. He explicitly

admitted "[h]e was not participating in any way with First Amendment activity." Dkt. 30-1 ¶ 5.

In turn, there is also a lack of evidence of the requisite causal connection between any

constitutionally protected activity and the actions of the law enforcement officers. *See Nieves*, 139

S.Ct. at 1722, *Molina*, 59 F.4th at 338; *Dreith*, 55 F.4th at 1148; *Bernini*, 665 F.3d at 1007.

Specifically, Schwab has not presented evidence of Entrekin, Bagby and Youngblut being

motivated by any First Amendment activity engaged in by Schwab. As explained by the Eighth

Circuit:

> to prevail on a First Amendment retaliation claim, the plaintiff must show that the
> defendant would not have taken the adverse action but for harboring "retaliatory
> animus" against the plaintiff because of his exercise of his First Amendment
> rights. *Nieves v. Bartlett*, 587 U.S. ——, 139 S. Ct. 1715, 1722, 204 L.Ed.2d 1
> (2019). It is not enough for the plaintiff to show that the defendant arrested or used
> force against the plaintiff in response to conduct that in fact was
> protected. *See Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010).
> If the response was driven not by "animus" but by the defendant's understanding—
> however mistaken—of his official duties, then it was not
> "retaliatory." *See id.* (affirming summary judgment for the defendants on a First
> Amendment retaliatory-arrest claim because the defendants arrested the plaintiffs
> based on a genuine albeit "unreasonable" belief that the plaintiffs' protest conduct
> violated the law).
>
> * * *
>
> Officers merely carrying out their duty as they understand it are not liable for
> retaliatory arrest or retaliatory use of force even if their understanding of their duty
> is mistaken—indeed, even if it is so mistaken as to be "unreasonable." *Baribeau*,
> 596 F.3d at 481. To be sure, they may be liable for unlawful arrest or use of
> excessive force. *See id.*; *infra* Section II.B. But constitutional torts of retaliation
> require acting on retaliatory animus.

*Mitchell v. Kirchmeier*, 28 F.4th 888, 896, 897-98 (8th Cir. 2022). There is an absence of evidence

in the record before this Court that either Entrekin, Bagby or Youngblut acted out of retaliatory

animus against Schwab.

As such, the First Amendment retaliatory claims asserted by Schwab fail as a matter of

law. Schwab has not shown questions of fact exist. Defendants are therefore entitled to summary

judgment as to the claims brought pursuant to the First Amendment to the United States Constitution under Count 5.

### B. Remaining State-Law Claims

Schwab's remaining claims are brought under Iowa state law: Count 2 asserting claims of illegal seizure in violation of Article I, section 8 of the Iowa Constitution; Count 4 asserting claims of excessive force in violation of Article I, section 8 of the Iowa Constitution; Count 6 asserting claims of retaliation in violation of Article I, section 7 of the Iowa Constitution; Count 12 asserting state law claims of malicious prosecution; Count 13 asserting state law claims of false arrest/imprisonment; Count 14 asserting state law claims of libel; and Count 15 asserting state law claims of assault and battery. After balancing the factors of judicial economy, convenience, fairness, and comity, the Court declines to exercise jurisdiction over the remaining state-law claims.

## VII. CONCLUSION AND ORDER

As set forth above, Defendants' Motion for Summary Judgment (Dkt. 24) is granted in part and remanded in part to state court. The Clerk of Court is directed to enter judgment in favor of defendants and against plaintiff on the claims asserted pursuant to the United States Constitution under Count 1, 3 and 5 of the Amended Petition at Law (Dkt. 11). As abandoned by plaintiff, the Clerk of Court is further directed to enter judgment in favor of defendants and against plaintiff on the claims asserted under Counts 7, 8, 9, 10, and 11; judgment in favor of Ernesto Escobar Hernandez and against plaintiff on the claim asserted under Count 14; and dismissal of all claims asserted against unidentified defendant John Doe.

Because the Court declines to exercise supplemental jurisdiction, the remaining claims asserted under Counts 2, 4, 6, 12, 13, 14 and 15 pursuant to the Iowa Constitution and Iowa common law are remanded to the Iowa District Court for Polk County.

IT IS SO ORDERED.

Dated March 29, 2023.

_____
STEPHEN B. JACKSON, JR.
UNITED STATES MAGISTRATE JUDGE